UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

| | |
|---|---|
| **JEREMIAH WOMACK** | **CASE NO. 3:20-CV-00076** |
| **VERSUS** | **JUDGE TERRY A. DOUGHTY** |
| **A B C INSURANCE CO ET AL** | **MAG. JUDGE KAYLA D. MCCLUSKY** |

**RULING**

Pending before the Court is a Motion for Summary Judgment [Doc. No. 57] filed by Defendant Dometic Corporation d/b/a/ SeaStar Solutions ("Dometic"). Plaintiff Jeremiah Womack ("Womack") filed an Opposition [Doc. No. 70]. Dometic filed a Reply [Doc. No. 76]. Also pending before the Court is Skeeter Products, Inc.'s ("Skeeter") Motion for Summary Judgment; or in the Alternative, Motion for Partial Summary Judgment [Doc. No. 63]. Womack filed an Opposition [Doc. No. 71] Skeeter filed a Reply [Doc. No. 78].

For the following reasons, Dometic and Skeeter's Motions for Summary Judgment [Doc. Nos. 57 and 63] are **GRANTED**, and Womack's claims are **DISMISSED WITH PREJUDICE**.

**I.     FACTS AND PROCEDURAL HISTORY**

This case arises out of an incident that occurred on February 2, 2019, when Womack was operating his new performance fishing boat, a 2018 Skeeter FX20 20 LE, alone on Caney Lake in Jackson Parish, Louisiana [Doc. No. 1].

This was not the first boat Womack owned and operated, nor was this the first Skeeter boat he owned and operated. [Id.] He previously owned a 2007 Skeeter boat. He purchased the boat at issue here in January 2019 from Anglers Outpost ("Anglers"), which is a Kentucky dealer. [Doc. Nos. 57, 63]. The boat was designed and manufactured by Skeeter and was equipped with a hydraulic steering system manufactured by Dometic. Skeeter purchased the Dometic steering

1

system, and Skeeter incorporated the steering system as one of many components into its boat design. [Id.]

According to his deposition, Womack visually inspected the boat with an Anglers' employee when he went to pick it up from the dealership. Included in his visual inspection was an overview of the "connections, hoses, and lines, and he did not see any leaks, cracks, or cuts." Womack was also given manuals for the boat and the component parts of the boat. Before he took the boat out for the first time, Womack stated that he went through all of the paperwork with the salesperson at Anglers, which included the aforementioned manuals. Womack stated in his deposition that it was his practice to review the owner's manual for anything he buys.[1]

Before the incident at issue, Womack took the boat on an approximate five-hour break-in drive [Doc. No. 1]. It was recommended that the boat be taken on the water for a ten-hour break-in period [Doc. No. 63]. It was on this first drive that he noticed a "little bit of skip" in the steering, which Womack described as going "from just a little tension to like a free play for just a split second, then it goes back." These skips were also described as "random" and "sporadic." [Doc. No. 57-3].

There is conflicting testimony regarding the following facts. According to Womack, he called Anglers to give a report on his first time operating the new boat [Doc. No. 70]. Defendants assert that Womack called Anglers to report the skip and request advice on what to do [Doc. Nos. 57, 63]. It is undisputed that Womack spoke to Jonathan Roseberry ("Roseberry"), a salesman at Anglers. According to Womack, Roseberry suggested he make an appointment with a local dealership as quickly as possible and to be careful with the boat [Doc. No. 70]. Roseberry stated that he suggested Womack bring the boat to a local dealer [Doc. No. 63-4]. He further stated that

---

[1] [Doc. No. 57-3, depo. of Jeremiah Womack]

he assumed it was an air pocket or something like that causing the steering skip. He also stated that he advised Womack not to use the boat because it was unsafe. Roseberry also stated that he told Womack the potential risk factors that could happened if he were to use the boat, including that he could lose control of the boat, that the boat could turn, and stated that an accident could occur. Roseberry also stated that Womack told him he intended to continue using the boat to break it in, despite Roseberry advising him to withhold use of the boat until a dealer was able to look at it [Id.].

While Womack and Roseberry have two different versions of what was said during the phone call with Anglers, both agree that Womack was told that there was likely a problem with his boat, and the problem needed to be addressed by a local boat dealer. Despite this, Womack did not take the boat to a local dealer for an inspection.

On February 2, 2019, Womack took the boat out again [Doc. No. 70]. Prior to taking it on the water, he re-read the manuals. Additionally, he checked the wheel by turning it all the way left and all the way right a few times. After this, Womack decided he was satisfied with the way the steering wheel performed and took the boat out onto the water.

The incident at issue is described by Womack as follows. Womack had the boat on the water and had been driving it for approximately ten minutes. He described the water on the lake that day as being "choppy." When Womack saw someone he thought he knew, he began to turn his boat to the right to head in the direction of his friend. When he made the turn, the boat suddenly turned sharply to the right and hooked around. He was thrown from his seat and into the console in front of the passenger seat. Dometic asserts that this type of sudden turn is called an "end-swap." After this happened, Womack was able to put the boat back into gear and drive it to the boat launch.

3

During this drive, Womack described the steering as "pretty slacky." Womack is claiming injuries as a result of this incident.[2]

Dometic and Skeeter both pointed out in their exhibits that there were labels affixed to the helm, steering cylinder, and the occupant area that were intact and legible [Doc. Nos. 57, 63]. The labels had information regarding the steering system (among other things). The labels instructed the operator that failure to comply with the instructions on the label can lead to "loss of steering control, leading to possible ejection from vessel causing property damage, personal injury and/or death" with further instructions to consult the owner's manual for more information [Doc. Nos. 57-6, 57-7]. The labels also advised that the operator not operate the boat if any parts were not operating properly. [Id.]

Skeeter Freshwater Owner's Manual ("the owner's manual") contains a specific section on steering. Most notably, the owner's manual stated "Your Skeeter Dealer should investigate any steering system irregularities immediately. DO NOT continue to operate the boat if the steering system is malfunctioning." [Doc. No. 63, p. 11].

**Post-Incident Activities**

Three days after the incident, on February 5, 2019, Womack took the boat to Morris Marine, LLC ("Morris Marine"), which is a local dealer in Louisiana. Morris Marine was to inspect the steering. He told Morris Marine that he assumed there was some air in the steering system. Morris Marine then bled the steering hydraulic system in an effort to remove any air from the system, and then took the boat on a test drive. Morris Marine deemed the boat unsafe and kept it in their possession. Morris Marine then contacted Skeeter and sent the boat to them for further testing.[3]

---

[2] The incident is described the same by Womack, Dometic, and Skeeter [Doc. Nos. 1, 57, 63, and 70].
[3] [Doc. Nos. 57, 63, and 70].

4

Skeeter employees then tested the boat and found no faults in the steering system. Despite finding no fault, Skeeter replaced the entire steering system for Womack. Skeeter did send the original steering system component parts from Womack's boat to Dometic for inspection and testing under a warranty return claim by Skeeter[4]. Dometic conducted a visual inspection and tested the steering system in their test bench system, which is specifically designed for testing the steering component parts. After running the tests, Dometic also found nothing wrong with the steering system. Dometic nevertheless offered to provide advanced replacement parts to the client[5]. These were sent to Skeeter prior to the tests conducted on the old steering system. Skeeter replaced the component parts that Dometic sent for the boat and returned the boat, with the new system, to Womack approximately a month after the incident. There have been no known issues with steering since its return to Womack.

**Experts**

Womack's expert, Kenneth Smith, Jr. ("Smith") was hired to issue an expert report on causation of the incident. Smith opined that there were three potential causes for Womack's incident. Those included: passing waves striking the bow, sudden turning by the operator, or uncommanded steering input caused by excess play in the steering system. Smith surmised that the most likely cause was "the sudden loss of continuity in the hydraulic system, allowing the motor to turn without turn command or feedback through the steering." Smith alleges several things that **may** have caused this, which include: air entrained in the system, low fluid level, failure of the helm pump internals, failure of the ram seals, the internal check valves jammed, or the internal check valves failed to fully close.[6]

---

[4] [Doc. No. 63]
[5] [Doc. No. 57]
[6] [Doc. No. 70-6, pp. 26-27]

Defendant Skeeter employed the use of several experts. Skeeter's expert, Robert Taylor ("Taylor"), is a naval architect and mechanical engineer. Taylor specializes in maritime design issues. Taylor inspected the boat on August 5, 2020. Taylor also reviewed Smith's expert report. He observed that Smith's report focused on an inboard system and not an outboard system, which was the type of system at issue in Womack's boat. Taylor ultimately concluded that in his experience, loss of hydraulic fluid in the air steering system becomes apparent before a complete or dangerous steering system lack of response.[7]

Skeeter's experts Kevin Breen and Casey Breen, of Engineering Systems, Inc., investigated and analyzed the incident, and they found that the configuration of the boat was consistent with performance fishing boats of its type. They opined that there was no evidence showing that any errors of the boat caused the accident.[8]

Dometic's expert, Dr. Wendy Sanders ("Sanders") is a licensed professional mechanical engineer specializing in forensic engineering; marine accident reconstruction; product design and failure analysis; mechanical, hydraulic and fuel system design and failure analysis; hazard analysis; and product warnings. Sanders opined that Womack's ability to completely turn the wheel from left to right several times before he launched the boat indicate that there was not a shortage of hydraulic fluid in the helm reservoir. Sanders also analyzed Smith's expert report and questioned Smith's failure to explain how he eliminated the passing waves and/or sudden turn by the operator as causes of the incident. Sanders suggested that driving at a high rate of speed during the break-in period can contribute to user error. Sanders also suggests that Smith's hypotheses rely on the fact that there would be some design defect or mechanical failure in the steering system, which Skeeter and Dometic both suggest were nonexistent. Sanders further suggested that if this

---

[7] [Doc. No. 63-10]
[8] [Id., 63-11]

were caused by internal failures, Womack likely would not have been able to regain control of the steering wheel after the incident, which he did.[9]

Womack brought this lawsuit against Skeeter and Dometic alleging that the boat at issue was unreasonably dangerous due to defective and/or inadequate warnings, nonconformity to express warranty, defective construction and/or composition, and defective design [Doc. No. 1]. In his Opposition [Doc. No. 70], Womack asserts that (1) Greg Williams, Morris Marine, and Skeeter employee Josh Bailey all stated that the brand-new Dometic steering system installed on Jeremiah Womack's boat was somehow defective, (2) Expert Ken Smith has noted that the warning labels on the Dometic steering system are ineffective in their placement and design and, (3) the warning labels are inconsistent with Dometic's own User Manuals which Jeremiah Womack followed prior to the accident at issue herein. Moreover, Womack argues that summary judgment based on the defendant's hired experts' conclusions would require a credibility determination as to the plaintiff and his expert, which is improper as a matter of law. Womack further asserts that Dometic nefariously destroyed evidence when Dometic disposed of the hydraulic steering system after testing it. Dometic argues in its Reply [Doc. No. 76] that after testing then replacing the system, the hydraulic steering system was entered into Dometic's database, issued a Returned Goods Authorization number to track the return, visually inspected by a warranty technician, and set up on a manual task bench to test the performance or operation of the unit. If there is no defect detected, then it is Dometic's policy to dispose of the item after testing it.

Womack filed suit in this Court on January 16, 2020, against Skeeter and Dometic seeking damages for the incident that allegedly caused him damages and personal injuries [Doc. No. 1].

---

[9] [Id., 63-12]

The issues are fully briefed, and the Court is prepared to issue a ruling.

## II.    LAW AND ANALYSIS

### A. SUMMARY JUDGMENT STANDARD

Summary judgment shall [be] grant[ed] . . . if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A fact is material if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id*.

In products liability actions under Louisiana law, the "plaintiff bears the burden of proving [the defendant's] fault, if any, and that the defendant's product caused her injuries, [and] all essential elements of her claim against the manufacturer, upon which she bears the burden of proof at trial." *Hebert v. Miles Pharms.*, No. CIV. A. 92-4290, 1994 WL 10184 (E.D. La. Jan. 13, 1994); *see also Willett v. Baxter Int'l, Inc.*, 929 F.2d 1094, 1100 (5th Cir. 1991). Rule 56 requires Plaintiff to come forward with sufficient evidence at the summary judgment stage to meet her burden of demonstrating facts to support the essential elements underlying each individual claim. *Id.* The moving party is not required to produce evidence to negate the existence of material facts when the non-moving party bears the burden of proof at trial. *Broussard v. P&G Co.*, 463 F. Supp. 2d 596, 604, n. 2 (W.D. La. 2006). Instead, the moving party can satisfy its summary judgment burden by "simply pointing out the absence of evidence supporting the non-moving party's case." *Id.*

If the moving party can meet the initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial. *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994). The nonmoving party must show more than some

8

metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In evaluating the evidence tendered by the parties, the Court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255.

### B. SPOLIATION OF EVIDENCE

The spoilation of evidence doctrine concerns the intentional destruction of relevant evidence. *Menges v. Cliffs Drilling Co.*, No. CIV. A. 99-2159, 2000 WL 765082, at *1 (E.D. La. June 12, 2000) (citing *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995); *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 78 (3d Cir. 1994)). If relevant evidence is spoiled (*i.e.,* intentionally destroyed), the trial court may exercise its discretion to impose sanctions on the responsible party. *See Vodusek,* 71 F.3d at 156; *Schmid,* 13 F.3d at 78. The seriousness of the sanctions that a court may impose depends on the consideration of:

> (1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future.

*Schmid,* 13 F.3d at 79 (citations omitted). Consistent with this measure of sanctions, a court may exclude the spoiled evidence or allow the jury to infer that the party spoiled the evidence because the evidence was unfavorable to that party's case. Exclusion of spoiled evidence, however, is a "drastic sanction" that courts generally try to avoid because exclusion would often unnecessarily eviscerate the plaintiff's case, especially when a lesser sanction would be sufficient. *See, e.g., Schmid,* 13 F.3d at 79 ("While we do not doubt the inherent authority of a district court to impose such a drastic sanction in an appropriate case, we conclude that this was not such a case."); *Am. Gulf VII, Inc. v. Otto Candies, Inc.*, No. CIV. A. 94-

3905, 1996 WL 520895, at *2 (E.D. La. Sept. 11, 1996) ("[T]o strike the entirety of [the testimony regarding the destroyed evidence] goes too far and would eviscerate plaintiff's case.").

The preferred alternative is "the well-established and long-standing principle of law that a party's intentional destruction of evidence relevant to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction." *Kronisch v. United States,* 150 F.3d 112, 126 (2d Cir.1998). *See, e.g., Vodusek,* 71 F.3d at 155; *Schmid,* 13 F.3d at 78; *Glover v. BIC Corp.,* 6 F.3d 1318, 1329 (9th Cir.1993); *Nation–Wide Check Corp. v. Forest Hills Distribs.,* 692 F.2d 214, 217–18 (1st Cir.1982); *In re Hopson Marine Transp., Inc.,* 168 F.R.D. 560, 567 (E.D.La.1996). This adverse inference rule "derives from the common sense notion that a party's destruction of evidence which it has reason to believe may be used against it in litigation suggests that the evidence was harmful to the party responsible for its destruction." *Kronisch,* 150 F.3d at 126. Accordingly, to restore the prejudiced party, an adverse inference "plac[es] the risk of an erroneous judgment on the party that wrongfully created the risk." *Id.* (quoting *Nation–Wide Check,* 692 F.2d at 218).

Before a court may exclude spoiled evidence or provide for an adverse inference to arise from the intentional destruction of evidence, "the party having control over the evidence must have had an obligation to preserve it at the time it was destroyed." *Id.* Such a duty "arises when the party has notice that the evidence is relevant to litigation." *Id.* Once a court concludes that a party was obliged to preserve the evidence, it must then consider whether the evidence was intentionally destroyed and the likely contents of that evidence. *See id.* at 127. *See also Caparotta v. Entergy Corp.,* 168 F.3d 754, 756 (5th Cir.1999) (adverse inference "predicated on bad conduct"); *Vodusek,* 71 F.3d at 156 (requiring intentional and willful conduct); *Anderson v. Production Management Corp.,* 2000 WL 492095, at *4 (E.D.La. Apr. 25, 2000) (no adverse

inference absent a showing of bad conduct); *In re Hopson Marine Transp., Inc.,* 168 F.R.D. at 567 (requiring wrongful denial).

**Did Dometic intentionally destroy evidence?**

Womack asserts that Dometic intentionally and nefariously destroyed the hydraulic steering system after it was sent to Dometic from Skeeter. Womack argues that there was a fault in the hydraulic steering system, and because Dometic opted to destroy that steering system, then there can be no certainty about whether there was a defect in the steering system.

As indicated above, Dometic argues that after testing then replacing the system, the hydraulic steering system was entered into Dometic's database, issued a Returned Goods Authorization number to track the return, visually inspected by a warranty technician, and set up on a manual task bench to test the performance or operation of the unit. If there is no defect detected, then it is Dometic's policy to dispose of the item after testing it. This is described as being part of Dometic's "typical practice and policy." [Doc. No. 76 at p. 5]. More importantly, Dometic states that it had no notice that the component part needed to be preserved for any reason. Dometic only knew that there was an abrupt turn of the boat during the break-in period, and it had not been informed that there was an accident involving injuries or potential legal claims as a result of the accident. Dometic disposed of the hydraulic steering system in February 2019. Dometic had not received notice of Womack's injuries until it was served with the lawsuit in February 2020. Dometic opines that it, therefore, did not take any purposeful action to destroy the hydraulic steering system.

Womack has not established a genuine issue of material fact that Dometic intentionally or nefariously destroyed evidence. Additionally, although Womack does not request an adverse inference based on spoliation of evidence, the Court finds that no such inference can be applied in

11

this case. Womack has not established that Dometic had an obligation to preserve the evidence at the time that it was destroyed. Dometic was not under any obligation at the time the evidence was disposed of to assume that that evidence should have been preserved. The Court, therefore, finds that Womack is not entitled to an adverse inference.

### C. LOUISIANA PRODUCTS LIABILITY ACT

Under the Louisiana Products Liability Act ("LPLA"), La. Rev. Stat. § 9:2800.51, *et seq*, "[t]he manufacturer of a product shall be liable to a claimant for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product...." La. Rev. Stat. 9:2800.54. A manufacturer is liable if its product is found unreasonably dangerous in one of four ways: construction or composition (R.S. 9:2800.55), design (R.S. 9:2800.56), inadequate warning (R.S. 9:2800.57), or nonconformity with an express warranty (R.S. 9:2800.58). *Id.*; *see also Holloway v. Midland Risk Ins. Co.*, 36,262 (La. App. 2 Cir. 10/30/02), 832 So. 2d 1004, 1011, *writ denied*, 2002-3247 (La. 3/28/03), 840 So. 2d 571 (citing *Young v. Logue*, 94-0585 (La. App. 4 Cir. 5/16/95), 660 So.2d 32).

Under the Act, a manufacturer can only be liable for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product. The plaintiff has the burden of proving causation (as well as an unreasonably dangerous condition), and a plaintiff must prove not only causation in fact, but also that the product defect was the most probable cause of injury. Thus, a manufacturer is not liable for damages brought about by an occurrence of a separate, independent, or superseding cause. *Wright v. Revco Industries Inc.*, 228 F.Supp.3d 749 (2017).

Defendants Dometic and Skeeter have moved for summary judgment on all remaining claims. Dometic contends that Womack's LPLA claim based on inadequate warnings fails because Womack cannot demonstrate that any allegedly inadequate warnings caused Womack's claimed damages. Dometic and Skeeter contend that Womack has abandoned his LPLA claims for unreasonably dangerous design or failure to conform to an express warranty because Womack only asserts that the steering system was unreasonably dangerous in construction and composition as provided in La. R.S. §9:2800.55, and that the system was unreasonably dangerous because adequate warnings about the product were not evident as provided in La. R.S. §9:2800.57. Defendants state that because Womack did not assert claims for unreasonably dangerous design or failure to conform to an express warranty, then Womack abandoned these claims.

The Court agrees. Accordingly, the Court will only analyze whether the steering system was unreasonably dangerous in construction or composition and/or whether the steering system was unreasonably dangerous for failure to provide an adequate warning.

### 1. Unreasonably Dangerous in Construction or Composition

Dometic and Skeeter assert in their Motions [Doc. Nos. 57, 78] that they are entitled to summary judgment because Womack cannot meet his burden of proof under the LPLA that the hydraulic steering system created by Dometic and installed by Skeeter was unreasonably dangerous in construction or composition.

In his Opposition [Doc. No. 70] Womack asserts that under Louisiana Law, a product is unreasonably dangerous in design or composition if it contains an unintended abnormality or condition rendering it more dangerous than it was designed to be, and further asserts that the characteristic rendering a product unreasonably dangerous must exist at the time that the product left the control of its manufacturer, or result from a reasonably anticipated alteration or

13

modification of the product [Id, p. 14]. Specifically, Womack asserts that the steering system contained an uninhibited abnormality, which rendered it more dangerous than it was designed to be. This abnormality allegedly caused an end swap in the steering system, which was not the intended purpose of the steering system and establishes that there was a flaw and defect in the system. Womack asserts no facts specifically alleging this, and only points to the fact that there was a defect when the steering system left the manufacturer because he was the first owner of the boat, and "considering Dometic opted to destroy the best evidence of what the defect was, no one will be able to know for sure, but expert Ken Smith has opined that it is likely there was a system failure that led to this accident" [Id., p. 15].

Womack further argues that there is a question of fact about whether there was a steering system defect at the time that the system left the manufacturer, or if it was a result from a reasonably anticipated alteration or modification of the product [Doc. No. 70]. Womack alleges that the installation of the steering system by Skeeter onto the boat is "clearly a reasonably anticipated alteration of modification of the product" [Id., p. 15]. Because he was the first owner of the boat, Womack's states that he never modified or altered the system, which he interprets to mean that there was either (1) a defect in the system when it left Dometic, or (2) the defect manifested itself when it was installed on the boat by Skeeter, which was a reasonably anticipated alteration or modification of the product. [Id.].

Womack additionally asks the Court to find liability under the doctrine of *res ipsa loquitor* because the incident with the boat itself is evidence enough that some defect existed.

Womack also argues issues relating to a "sticky valve." Dometic asserts in its Reply [Doc. No. 76] that this reference is referring to an issue with a different boat, i.e., one that is unrelated these proceedings. The Court agrees and will not be addressing this issue.

14

To the extent that Womack alleges that Dometic's steering system contained an unintended abnormality that rendered it more dangerous than it was designed to be, Dometic asserts that Womack has presented no evidence to support a finding that the steering system was unreasonably dangerous when it left Dometic's control. Further, in Womack's analysis, he erroneously applied the standard set forth in La. R.S. 9:2800.55 by arguing that an unreasonably dangerous condition could result from a reasonably anticipated alteration or modification of the product. Dometic argues that this is not the standard, and Womack cannot prove that there was a defect in the construction or composition of the steering system when it left Dometic's control. Skeeter adopts Dometic's arguments [Doc. No. 78].

Louisiana Revised Statute 9:2800.55 states:

> A product is unreasonably dangerous in construction or composition if, at the time the product left its manufacturer's control, the product deviated in a material way from the manufacture's specifications or performance standards for the product or from otherwise identical products manufactured by the same manufacturer.

In order to establish that a product was unreasonably dangerous in construction or composition, a claimant must demonstrate what a manufacturer's specifications or performance standards are for a particular product and how the product in question materially deviated from those standards so as to render it unreasonably dangerous. *James Hugh Otwell, et al. V. Sidney Hutchison, et al. Additional Party Names: Ace Tire & Axle, Inc., Cappaert Manufactured Hous., Inc., Carrie Otwell, Nat'l Fire Ins. Co.*, No. 3:18-CV-00523, 2020 WL 837381 (W.D. La. Feb. 19, 2020), *see also Milton v. Rapiscan Sec. Prod.*, No. CIV.A.04-591, 2005 WL 1400433 (E.D. La. June 6, 2005); *Welch v. Technotrim, Inc.*, 34-355 (La. App. 2 Cir. 1/24/01), 778 So.2d 728.

Here, Womack has failed to develop any evidence that the subject product (hydraulic steering system) in any way deviated from the manufacturer's specifications or performance

standards and, therefore, he cannot meet his burden of proving a manufacturing defect at trial. Moreover, under Louisiana law, a trier of fact may not infer the existence of a vice or defect in a product merely based on the fact an accident occurred. *Jaeger v. Automotive Cas. Ins. Co.,* 1995-2448 (La. App. 4 Cir. 10/9/96), 682 So.2d 292.

For this reason alone, Womack's argument that the doctrine of *res ipsa loquitor* applies to this case, simply because of the accident itself, fails. However, the Court will nevertheless analyze the doctrine of *res ipsa loquitor* to these facts. For *res ipsa* to apply, Womack must "sufficiently exclude inference of the plaintiff's own responsibility or the responsibility of others besides defendant in causing the accident." *Lawson v. Mitsubishi Motor Sales of Am., Inc.*, 2005-0257 (La. 9/6/06), 938 So. 2d 35, 48. Further, *res ipsa* "can be applied only where the instrumentality which caused the accident was under the control of the defendant, and where the accident was of the type that leaves no room for any presumption other than the negligence of the defendant against whom the doctrine is sought to be applied." *Lacassin v. Virco, Inc.*, No. 6:11-CV-2104, 2012 WL 6183682 (W.D. La. Dec. 11, 2012) (citing a series of Louisiana court decisions). Where plausible theories for the cause of accident other than the defendant's negligence are presented, *res ipsa* is inapplicable. *Cavanaugh v. Pirelli Armstrong Tire Corp*., 1997 U.S. Dist. LEXIS 14682, at *4-5 (E.D. La. Sep. 17, 1997).

Here, these conditions are not present because Defendants were not in control of the boat at the time of the accident--Womack was. Further, there are other plausible theories for the cause of the accident, including operator error, as well as Womack's operating the boat even though he admittedly had read the warnings and was aware that there was a steering problem.

Therefore, res ipsa loquitur is not available under these factual circumstances.

Womack has failed to offer any evidence that Dometic's hydraulic steering system, installed into the boat by Skeeter, was unreasonably dangerous in construction or composition.

### 2. Unreasonably Dangerous because of Inadequate Warnings

Dometic and Skeeter both assert in their Motions that Womack cannot establish that the steering system was unreasonably dangerous because of an inadequate warning because he has presented no evidence to support a claim that the warnings that were on the steering system were inadequate or that they caused his injuries.

Womack argues in his Opposition that the warnings were (1) difficult to read, (2) inconsistent with the Dometic User Manuals, and (3) caused confusion. Womack goes on to argue that these warnings were "a direct cause of [his] injuries" because if the warnings had been accurate or consistent with the user manual, he never would have started his boat [Doc. No. 70, p. 16].

In a failure to warn case, a product is considered unreasonably dangerous if the claimant can prove that "at the time the product left the manufacturer's control, the product possessed a characteristic that may cause damage, and the manufacturer failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product." La.R.S. 9:2800.57(A). The LPLA defines "[a]dequate warning" as:

> A warning or instruction that would lead an ordinary reasonable user or handler of a product to contemplate the danger in using or handling the product and either to decline to use or handle the product or, if possible, to use or handle the product in such a manner as to avoid the danger for which the claim is made.

La.R.S. 9:2800.53(9). *Walker v. Manitowoc Co., Inc.*, 2016-897 (La. App. 3 Cir. 10/10/18), 259 So. 3d 465. A product is unreasonably dangerous because an adequate warning about a damage-causing characteristic of the product has not been provided. A manufacturer is not required to provide an adequate warning about its product when the user of the product already knows, or

reasonably should be expected to know of the characteristic of the product that may cause damage and the danger of such characteristic. *Wright*, 228 F.Supp.3d 749.

"Whether a particular warning or instruction is adequate is a question for the trier of fact." *Jack v. Alberto-Culver USA, Inc.*, 06-1883, p. 5 (La. 2/22/07), 949 So.2d 1256, 1259. Several factors come into play in determining the adequacy of the warning, namely: (1) "the severity of the danger," (2) the likelihood of successful communication of the warning to foreseeable consumers, (3) "the intensity and form of the warning," and (4) "the cost of improving the strength or mode of the warning." *Walker*, 2016-897 La. App. 3 Cir. 10/10/18, *See also Bloxom v. Bloxom*, 512 So.2d 839, 844 (La.1987).

Womack contends that *Walker* supports his position. In *Walker*, 2016-897 La. App. 3 Cir. 10/10/18, the defendants had a known defect in their product. After discovering the defect, service bulletins were sent only to distributors to issue warnings to the users of the product. The issue in the case, however, was that the product that caused damages was one that had a known defect, and the service bulletin was never sent to the owners of the product. The court had to address whether the defendants breached their duty to warn by issuing the bulletins to distributors only and not to owners. The court found that the defendants did breach their duty to warn for failing to send the bulletins to the owners of the product and because the defect at issue could have caused injuries and damages.

Womack has provided no evidence proving that there was a defect in the hydraulic steering system or that Dometic or Skeeter knew of a defect in the steering system prior to its installation in the boat. Womack also has not established that there was a lack of warning. Unlike in *Walker*, 2016-897 La. App. 3 Cir. 10/10/18, Womack cannot establish that there was a defect in the steering

system and that Dometic or Skeeter knew of the defect prior to it leaving their control and did not warn against it.

Womack additionally asserts that the Dometic warning labels are difficult to read. Dometic and Skeeter both attached photographs of the warning labels to their Motions. The Court finds that the warning labels are not difficult to read, are placed in visible locations, and are correctly labeled as "Warnings."

Womack next argues that the warnings are inconsistent with the Dometic user manual. Dometic and Skeeter argue that Womack is cherry picking the warning labels and statements from the user manuals to show that there are inconsistencies in the warnings. The Court agrees. Womack is erroneously pointing out "notices" from the user manual rather than actual warnings. Further, despite his familiarity with the warnings, Womack did not follow them and proceeded to operate the boat with knowledge that there was something wrong with the steering system. He seemingly ignored the warning, located on multiple labels on the boat and in the Owner's Manual, stating, "DO NOT OPERATE BOAT IF ANY COMPONENT IS NOT IN PROPER WORKING CONDITION." Womack's argument that the warning labels and the user manual are inconsistent and contradictory is, therefore, inaccurate.

Finally, Womack asserts that the warning labels are confusing. However, Womack only states that the labels are confusing. He does not provide any evidence to the Court why the labels are confusing.

The Court finds that Womack has failed to meet his burden of proof and has not established a genuine issue of material fact that the hydraulic steering system was unreasonably dangerous because of inadequate warnings.

Womack has, therefore, failed to establish a claim under the LPLA because of unreasonably dangerous construction or composition and/or inadequate warnings. Dometic and Skeeter's Motions for Summary Judgment are **GRANTED**.

### 3. Remaining Claims

In his Complaint, Womack alleges that "the vessel and steering issues in this matter constitute willful and wanton conduct on the part of the manufacturers" and, therefore, he is entitled to punitive damages [Doc. No. 1, p. 5]. However, having concluded that Womack has failed to establish his underlying LPLA claims, it follows that Womack's claim for punitive damages must also fail.

### III. CONCLUSION

For the reasons set forth herein, Dometic and Skeeter's Motions for Summary Judgment [Doc. Nos. 57 and 63] are **GRANTED**, and all of Womack's claims against Defendants are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that all pending Motions in this matter are **DENIED** as moot.

MONROE, LOUISIANA, this 23rd day of February 2022.

_____
TERRY A. DOUGHTY
UNITED STATES DISTRICT JUDGE